# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### LAREDO DIVISION

| | |
|---|---|
| NORA ISABEL LAM GALLEGOS individually and on behalf of the estate of Guillermo Arevalo Pedraza, deceased, and as next friend of P.A.L. and M.A.L., minor children, *Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA, JANET NAPOLITANO, DAVID V. AGUILAR, ALAN BERSIN, MICHAEL J. FISHER, MICHAEL C. KOSTELNIK, ROBERT L. HARRIS, JOHN ESQUIVEL, DANIEL SCHAEFFER, RAMIRO RODRIGUEZ, MATTHEW LAMBRECHT, CHRISTOPHER W. BOATWRIGHT, and DOES 1-3, *Defendants*. | Civil Action No. 5:14-CV-00136<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

This lawsuit seeks redress for the death of Guillermo Arevalo Pedraza, ("Arevalo"). Arevalo was killed as a result of the United States Border Patrol's so-called "Rocking Policy." Pursuant to the Rocking Policy, Border Patrol agents along the nation's southern border deemed the throwing of rocks at them to be per se lethal force to which the agents could legitimately respond with fatal gunfire. Under the Rocking Policy, Border Patrol agents shot to kill Mexican nationals who allegedly threw rocks at them, regardless of whether the alleged rock-throwing posed an imminent risk of death or serious injury to the agents or anyone else, and regardless of whether other, non-lethal means were available to avert any such risk. In recent years, Border

Patrol agents acting pursuant to the Rocking Policy shot and killed at least thirteen persons and seriously injured more. The Rocking Policy had the imprimatur of the highest officials of the Department of Homeland Security.  This institutionalized, systematic use of excessive, lethal force violated the U.S. Constitution, U.S.-ratified treaties, peremptory international norms, and our fundamental national values.

## PARTIES

### A.  Plaintiffs

1.      Plaintiff Nora Isabel Lam Gallegos is the widow of Guillermo Arevalo Pedraza. She brings this action in her individual capacity, on behalf of the estate of Guillermo Arevalo Pedraza, and as the next friend of minor children P.A.L. and M.A.L.  Arevalo was a Mexican national of Hispanic descent.

2.      Plaintiff P.A.L. is the minor child of Guillermo Arevalo Pedraza.

3.      Plaintiff M.A.L. is the minor child of Guillermo Arevalo Pedraza.

### B.  Defendant United States

4.      Defendant United States of America is a sovereign nation that has waived its sovereign immunity for the claims that Plaintiffs assert against it.  At all relevant times Defendant United States was the government entity that controlled, directed, and otherwise oversaw the Department of Homeland Security ("DHS") and employed the Supervisor Defendants and Agents (identified below), all of whom were acting under color of law and within the purported course and scope of their employment with respect to the conduct about which Plaintiffs complain.  Defendant United States was responsible for the training of these supervisors and agents and for making and implementing policies and practices used by these

agents regarding their use of force.  Defendant United States was responsible for authorizing, directing, and implementing the unlawful Rocking Policy that resulted in Arevalo's death.

5.     DHS is a Cabinet-level department of the executive that is responsible for the coordination and unification of national security efforts.  DHS and each of its components are charged by law to enforce the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents are properly trained and obey the laws of the United States. At all relevant times, supervisors of DHS had specific knowledge of and acquiesced to a pattern and practice of border patrol agents' excessive use of force pursuant to a Rocking Policy as alleged herein, and the failure of DHS to timely conform agents' use of force to the requirements of law caused the unlawful death of Arevalo.

6.     The United States Customs & Border Protection ("CBP") is a federal law enforcement agency and a component of DHS.  CBP is responsible for securing the borders of the United States with a stated mission to "safeguard the American homeland at and beyond our borders."  *See* http://www.cbp.gov/aboutCBP.  The agency is supervised by a Commissioner, who has the responsibility for and oversight over policies, procedures, and practices for several offices within the agency.  The offices relevant to this Complaint are the Office of Border Patrol, supervised by the Chief of Border Patrol, and the Office of Air and Marine, supervised by an Assistant Commissioner.   At all relevant times, supervisors of CBP had specific knowledge of and acquiesced to a pattern and practice of border patrol agents' excessive use of force pursuant to a Rocking Policy as alleged herein, and the failure of CBP to timely conform agents' use of force to the requirements of law caused the unlawful death of Arevalo.

7.     The Office of Border Patrol ("OBP") is a law enforcement agency and a component of CBP specifically responsible for patrolling the land and coastal borders of the

United States.  The Chief of Border Patrol has responsibility for and oversight over the training of all Border Patrol agents and the policies, procedures, and practices relating to agents' use of force.  The Chief of Border Patrol has the authority and responsibility to issue directives to all personnel under his or her supervision to ensure agents' practices remain within the limits of the constitution and consistent with the policies of the DHS and CBP.  The Chief of Border Patrol is the direct supervisor of, among others, each Chief Patrol Agent among thirteen Border Patrol Sectors.  In turn, the Chief Patrol Agent is the direct supervisor of the Border Agent in Charge of each Border Patrol Station within the Sector.  Every border patrol agent on duty operates under the direct supervision of a Supervisory Border Patrol Agent.  At all relevant times, supervisors of OBP had specific knowledge of and acquiesced to a pattern and practice of border patrol agents' excessive use of force pursuant to a Rocking Policy as alleged herein, and the failure of any relevant supervisor within OBP to timely conform agents' use of force to the requirements of law caused the unlawful death of Arevalo.

8.      The Office of Air and Marine ("OAM") is another operational component of CBP, with the mission to protect the American people and the Nation's critical infrastructure through the coordinated use of integrated air and marine forces "toward or across the borders of the United States."  *See* http://www.cbp.gov/border-security/air-sea.  Through Joint Field Commands, OAM and OBP integrate operations and supervision over border patrol agents assigned to Marine or Air Units.  The South Texas Campaign Commander reports to both the Chief of Border Patrol and the Assistant Commissioner of OAM and is the direct supervisor of the Director of Marine Operations of Laredo Sector, who in turn is the direct supervisor of the Supervisory Border Patrol Agents assigned to the Laredo's Marine Unit.  At all relevant times, supervisors of both OAM and OBP had specific knowledge of and acquiesced to a pattern and

4

practice of border patrol agents' excessive use of force pursuant to a Rocking Policy as alleged herein, and the failure of any relevant supervisor within OAM or OBP to timely conform agents' use of force to the requirements of law caused the unlawful death of Arevalo.

### C. Border Patrol Agent Defendants

9.      Defendant Matthew Lambrecht is the Border Patrol Agent who had command and control of the CBP airboat from which another agent fired the fatal rounds that struck and killed Arevalo.   As commander of the vessel, Defendant Lambrecht had direct control and responsibility for the decision to fire those fatal rounds.  Defendant Lambrecht was at all relevant times employed by the United States as a Border Patrol agent assigned to the Marine Unit in Laredo Sector. At all times described in this Complaint, Defendant Lambrecht was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the United States, and under color of legal authority.  Plaintiffs sue Defendant Lambrecht in his individual capacity.

10.      Defendant Christopher W. Boatwright is the Border Patrol Agent who fired the fatal rounds that struck and killed Arevalo.  Defendant Boatwright was at all relevant times employed by the United States as a Border Patrol agent assigned to the Marine Unit in Laredo Sector. At all times described in this Complaint, Defendant Boatwright was acting in his capacity as a sworn law enforcement or peace officer, agent, servant, or employee of the United States, and under color of legal authority.   Plaintiffs sue Defendant Boatwright in his individual capacity.

11.      Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant DOES 1–3, Agents of U.S. Border Patrol, and therefore sue those Defendants by fictitious names.  Plaintiffs are informed and believe, and on that basis allege, that

each DOE Defendant is in some manner responsible and liable for the acts and/or damages alleged in this Complaint, and that among these DOE Defendants are those Border Patrol agents who either also shot Arevalo and/or otherwise directly contributed to Arevalo's death, and that all of these Defendants acted under color of law.   Plaintiffs will amend this Complaint to allege the DOE Defendants' true names and capacities when they have been ascertained.

12.     Plaintiffs sometimes refer herein to Defendants Boatwright, Lambrecht, and DOE Defendants as the "Agents."

### D.  Supervisor Defendants

13.     Defendant Janet Napolitano served as the 3rd Secretary of DHS from January 21, 2009 through September 6, 2013.  Defendant Napolitano was a supervisor of the Agents and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.   As Secretary, Defendant Napolitano, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Napolitano in her individual capacity.

14.     Defendant David V. Aguilar became Chief of OBP in 2004 where he presided over the largest expansion of the Border Patrol in its 88-year history.   He became Deputy Commissioner of CBP in April 2010, serving as acting Commissioner of CBP in 2011 until he retired on Feb 8, 2013.  Defendant Aguilar was a supervisor of the Agents and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.   At all relevant times as supervisor, Defendant Aguilar, at a minimum, knew of and acquiesced to the

6

unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.  Plaintiffs sue Defendant Aguilar in his individual capacity.

15.     Defendant Alan Bersin served as the Commissioner of the CBP from March 2010 through December 2011, and is currently the Assistant Secretary of International Affairs and Chief Diplomatic Officer for DHS.  Defendant Bersin was a supervisor responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.  At all relevant times as supervisor, Defendant Bersin, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.  Plaintiffs sue Defendant Bersin in his individual capacity.

16.     Defendant Michael J. Fisher has served as the Chief of the Border Patrol from May 2010 to the present.  Defendant Fisher was a supervisor of the Agents at the time of Arevalo's death and was, and is still, responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obey the laws of the United States.  At all relevant times as supervisor, Defendant Fisher, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Fisher in his individual capacity.

17.     Defendant Michael C. Kostelnik served as Assistant Commissioner of CBP for the Office of Air and Marine since before 2007 until December 2012.  Defendant Kostelnik was a supervisor of the Agents and was responsible by law for enforcing the United States

Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.  At all relevant times as supervisor, Defendant Kostelnik, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Kostelnik in his individual capacity.

18.     Defendant Robert L. Harris assumed command as Chief Patrol Agent of the Laredo Sector on October 25, 2009.  In March 2012, Defendant Aguilar selected Defendant Harris as CBP Commander for South Texas to oversee the South Texas Campaign and provide oversight over CBP components, including OBP and OAM, within the South Texas Corridor.  At the time of Arevalo's death, Defendant Harris was a supervisor of the Agents, and was, and still is, responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obey the laws of the United States. At all relevant times as supervisor, Defendant Harris, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Harris in his individual capacity.

19.     Defendant John Esquivel was the Deputy Chief Patrol Agent and/or Acting Chief Patrol Agent of Laredo Sector before 2010 until shortly after the death of Arevalo in September 2012. Defendant Esquivel was a supervisor of the Agents and was responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obeyed the laws of the United States.  At all relevant times as supervisor Defendant Esquivel, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements

of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Esquivel in his individual capacity.

20.     Defendant Daniel Schaeffer is the Director of Marine Operations for Laredo Sector and has served in that supervisory capacity since before 2009.  At the time of Arevalo's death, Defendant Schaeffer was the supervisor of the Agents and a direct supervisor of Defendant Ramiro Rodriguez, and was, and still is, responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obey the laws of the United States.  At all relevant times as supervisor, Defendant Schaeffer, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Schaeffer in his individual capacity.

21.     Defendant Ramiro Rodriguez is a Supervisory Boarder Patrol Agent and served in that position in Laredo Sector for several years before and through the date of Arevalo's death on September 3, 2012.   At the time of Arevalo's death, Defendant Rodriguez was the direct supervisor responsible for the Agents and was, and is still, responsible by law for enforcing the United States Constitution, laws, and regulations and for ensuring that Border Patrol agents were properly trained and obey the laws of the United States.   At all relevant times as supervisor Defendant Rodriguez, at a minimum, knew of and acquiesced to the unlawful Rocking Policy as defined herein and failed to conform agents' use of force to the requirements of law, thereby causing the death of Arevalo.   Plaintiffs sue Defendant Rodriguez in his individual capacity.

22.     Plaintiffs sometimes refer herein to Defendants Napolitano, Aguilar, Bersin, Fisher, Kostelnik, Harris, Esquivel, Schaeffer, and Rodriguez as the "Supervisor Defendants."

## JURISDICTION AND VENUE

23.     This Complaint is for compensatory damages and other relief based on civil rights and human rights violations committed by officers and employees of the United States, all of whom were acting under color of law and within the course and scope of their employment and in violation of the Fourth and Fifth Amendments to the U.S. Constitution.   In addition, the United States' conduct violated the law of nations and applicable treaties between the United States and Mexico, and is thus actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350.

24.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1350, because Plaintiffs' claims arise under the U.S. Constitution and are authorized by *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and properly invoke the law of nations and applicable treaties.

25.     To the extent that exhaustion of administrative remedies is required with respect to Plaintiffs' claims pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, which Plaintiffs deny, Plaintiffs have exhausted the administrative remedies prescribed by 28 U.S.C. § 2675 by timely presenting their claims to Defendants on July 29, 2013.   As of the date of this Complaint, Defendants have neither admitted nor denied Plaintiffs' administrative claims.   This Complaint is filed more than six months after Plaintiffs presented their administrative claims.

26.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1)(A)&(B), because this is the judicial district in which events and omissions giving rise to the claims occurred and in which a defendant resides.

**FACTS**

**II.   THE AGENTS' KILLING OF AREVALO**

27.     During the afternoon of September 3, 2012, Arevalo, his wife, Nora, and his daughters, P.A.L. and M.A.L., were enjoying a quiet family picnic at Los Patinaderos Park in Mexico near the bank of the Rio Grande River.  The family had gathered together to celebrate the birthdays of Nora, P.A.L., and M.A.L.  That day, once a joyous family occasion, soon changed from celebratory to catastrophic.  As the family laughed, played, and cooked with others alongside the river, the Agents, without warning or provocation, opened fire on the crowd.  Two bullets struck Arevalo—one in the abdomen and one in the leg.

28.     The Agents who gunned down Arevalo were in a Border Patrol airboat on the United States' side of the river.  After Arevalo fell to the ground, covered in blood, his wife began to scream, "They killed him, they killed him, they have killed him."  The Agents in the airboat quickly fled the scene of their crime, rendering no assistance to the dying Arevalo.  Instead, the Agents left Arevalo dying from the gunshot wounds in the arms of his 9-year-old daughter, M.A.L., with his wife and older daughter standing only feet away.

29.     More than two dozen people, including children, witnessed the Agents' killing of Arevalo.  The majority of these witnesses are Mexican nationals who, much like Arevalo, were picnicking with their families in Los Patinaderos Park.

30.     Before opening fire on the crowd, the Agents had attempted to apprehend a person who was trying to swim from the United States side of the territorial border to the Mexico side.  The swimmer was not affiliated with Arevalo or even known to him.  The swimmer had already crossed the river from Mexico to the United States and was out of the water on the

11

riverbank when he heard the sound of a boat.  Fearing that the boat contained immigration officers who would detain him, the swimmer jumped back into the Rio Grande and began to swim back to the Mexican side of the river.

31.     The approaching boat was a Riverine Class 16-Foot Diamondback airboat specifically designed for speed, maneuverability, and durability, and to be used by the CBP to patrol the waters of Rio Grande.  The boat is as nimble as it is powerful, equipped with an above-hull propeller and rudder system that allows for easy maneuvering. At the center of the hull is a windshield that stands upright in front of two seats, protecting the occupants from any projectiles.

32.     The Agents on the airboat were equipped with assault rifles capable of firing in 3 round burst, semi-automatic, or fully automatic modes, and with semi-automatic .40 pistols as side arms.

33.     When the swimmer began trying to make his way back to Mexico, the Agents quickly cut him off.  The Agents began to harass the visibly exhausted swimmer near the bank on the United States side of the river.  They hit him with their boat hooks and blasted him with bursts of water from the vessel's propeller.  The swimmer was clearly having trouble coping with the fast moving current and the waves from the airboat.  Watching him struggle for air, the families on the Mexican side of the river began to shout at the Agents to stop before they killed the man.

34.     Without warning or provocation, the Agents opened fire on the Mexican families, spraying rounds across the river, over the border, and into Mexico.  Defendant Boatwright fired the two rounds that struck and killed Arevalo.  Boatwright was acting in concert with Defendant Lambrecht, who was commanding the vessel.

12

35.     The Agents unlawfully used excessive force, causing Arevalo's death.

36.     In the aftermath of the killing, the Border Patrol issued a statement asserting that the Agents had been subjected to rocks thrown from the Mexico side of the border.  That account of events is contradicted by numerous witnesses who were present in the Park, who insist that no one threw any rocks at the Agents.

37.     Even if someone had thrown rocks at the Agents, their response was grossly excessive.  Not even the statement issued by the Border Patrol asserts that the alleged rocks posed a risk of death or seriously bodily injury to the Agents or anyone else.  Any such assertion would be preposterous.  The witness statements and a cellphone video of the incident demonstrate that when the Agents opened fire they were far beyond the distance at which any thrown rock could pose such a risk.

38.     Moreover, none of the witnesses asserts that Arevalo had thrown any rock or was in the process of throwing any rock when the Agents killed him.  He was in the Park for a picnic with his family.

39.     And if Arevalo had thrown any rock at the Agents or was in the process of throwing a rock – which he emphatically was not – the Agents could have maneuvered the boat to shield themselves from any alleged rock-throwing or simply moved the boat out of range.

40.     Notably, the Agents would not have been justified in shooting Arevalo or anyone else even if doing so had been necessary to apprehend the swimmer – which it was not.  The Agents well knew that law enforcement officers are not justified in using deadly force to apprehend a fleeing suspect.  And in fact the Agents did not fire into the crowd of families in an effort to apprehend the swimmer.  Having fatally shot Arevalo, the Agents sped away in the boat without further effort to apprehend the swimmer (who in fact made his way back to Mexico).

13

### III.   THE ROCKING POLICY

41.     The Agents' use of excessive, lethal force against Arevalo did not spring from their spontaneous acts.  Instead, they were acting pursuant to, and implementing, a Rocking Policy that had the imprimatur of the highest-ranking DHS and CBP officials.

42.     At all relevant times, each Supervisor Defendant knew, or reasonably should have known, that Border Patrol agents operating on land and on the water:

    a.     had a regular pattern and practice deeming others' throwing of rocks at them to be per se lethal force that justified the agents' shooting to kill the alleged rock-throwers;

    b.     had a pattern and practice of using excessive, lethal force along the United States border by shooting at people suspected of throwing rocks despite those agents having the ability to take cover, move out of range, or employ less lethal weapons or alternatives;

    c.     understood that their supervisors had, at a minimum, tacitly approved Border Patrol agents' shootings along the border so long as the agents claimed a rock was thrown;

    d.     had a pattern and practice of taking advantage of the existence of the Rocking Policy to justify the unlawful use of excessive force by falsely asserting that they were in mortal danger from rocks being thrown at them.

43.     Pursuant to this unlawful Rocking Policy, Border Patrol agents along the southern border regularly used excessive, lethal force against persons of perceived Hispanic descent and Mexican nationality.

### IV.   SUPERVISOR DEFENDANTS' KNOWLEDGE AND APPROVAL OF THE ROCKING POLICY

44.     Firing live bullets in response to thrown rocks is, absent highly unusual circumstances not present here, grossly excessive force.  The National Law Enforcement Officers Memorial Fund has gathered records on all police officers killed in the line of duty since the first U.S. patrolman was killed in 1792.   In those 200+ years, exactly one police officer (in

14

1942) was killed by a thrown rock.  Most police departments teach their cadets that a rock is not

deadly beyond 50 feet.  Unless they are performing a particularly important mission, like aiding

a wounded colleague, officers facing thrown rocks should simply retreat beyond that perimeter.

45.     Despite actual knowledge of the patently unlawful Rocking Policy, the Supervisor

Defendants failed and refused to repudiate it publicly or through the chain of command; failed

and refused to issue, publicly or through the chain of command, a lawful policy regarding the use

of force in response to alleged rock-throwing; failed and refused to provide adequate training to

agents regarding lawful responses to alleged throwing of rocks; and failed and refused to

appropriately discipline agents who act unlawfully pursuant to the Rocking Policy.

46.     The Supervisor Defendants were at all relevant times personally responsible for

developing, authorizing, supervising, and/or implementing the policies, patterns, or practices

governing the Border Patrol agents' use of lethal force.  Each Supervisor Defendant in fact knew

of, approved, and implemented the unlawful Rocking Policy.  That knowledge and approval is

demonstrated by a host of evidence, including (1) the Supervisor Defendants' knowledge of and

acquiescence in a whole series of unlawful Border Patrol killings; (2) the Supervisor Defendants'

knowledge of and acquiescence in public statements by Border Patrol agents' representatives that

throwing rocks is per se lethal force justifying an agent's shooting to kill; (3) the Supervisor

Defendants' knowledge of and acquiescence in the U.S. Department of Justice's conclusion that

an agent's shooting of an unarmed and unthreatening teenager was consistent with Border Patrol

policy and training; (4) the Supervisor Defendants' consistent rejection of repeated entreaties

from numerous national and international human rights organizations deploring the Rocking

Policy and requesting remedial action; (5) the findings of a Police Executive Research Forum

("PERF") report, which Defendants themselves had commissioned, which concluded that the

Rocking Policy was unlawful and should be eliminated; and (6) admissions by a high-ranking CBP internal affairs official that Defendants knew of and condoned Border Patrol agents' unlawful use of excessive force.

47.     Despite each Supervisor Defendant's actual knowledge, none of them objected to or demanded a stop to the systematic use of unlawful lethal force along the southern border. Because of the lack of objection, intervention, or clarification by any Supervisor Defendant, Border Patrol agents along the southern border considered the Rocking Policy to be approved all the way up the chain of command.  When Defendants Lambrecht and Boatwright and the other Agents opened fire on a beach full of picnickers on September 3, 2012, they did so knowing that the Supervisor Defendants had for years known of, acquiesced in, and condoned other similar killings.

### A. Supervisor Defendants' Knowledge of and Acquiescence in Numerous Prior Border Patrol Killings Under the Rocking Policy.

48.     The CBP at all relevant times had a protocol that required the filing of a Significant Incident Report after every encounter in which a Border Patrol agent applied use of force.  Once completed, every such Report was emailed to every supervisor at every level of the agency on a daily basis.  At minimum, each Supervisor Defendant knew of the facts underlying each incident described herein through receipt of that email.   Defendant Napolitano knew of each of these incidents because they resulted in the death of the victim.

49.     Among the unlawful Border Patrol killings of which the Supervisor Defendants had actual knowledge are these:

>      a.     In 2003, Border Patrol agents killed Ricardo Olivares Martinez by shooting him five times as he attempted to flee.  Agents alleged he was throwing rocks.

b.      In 2005, Border Patrol agents shot and killed Guillermo Martinez Rodriguez as he attempted to flee back into Mexico.  The agents alleged he was simultaneously throwing rocks and running away.

c.      In 2006, Border Patrol agents near the Andrade Port of Entry in California were apprehending a suspect who was swimming across the Colorado River when, they contend, a group of Mexican nationals began throwing rocks from the bank on the Mexican side of the river.  The agents opened fire into the group, killing one man.

d.      In 2007, a Border Patrol agent shot and killed José Alejandro Ortiz-Castillo as he was attempting to illegally enter the United States.  The agent claimed that Ortiz-Castillo provoked the shooting by threatening an agent with a rock.

e.      In 2007, a Border Patrol agent shot and killed Francisco Dominguez, falsely claiming that Dominguez was about to hit him in the head with a rock.

f.      In 2007, a Border Patrol agent in Calexico, California shot an unidentified Mexican who was in a raft in the All-American Canal.  The agent claimed that the man, who had turned the raft back towards Mexico when he saw the agent, was attempting to throw a rock.

g.      In 2008, Border Patrol agents shot and killed Edgar Israel Ortega Chavez while he was across the border in Mexico.  Agents alleged he was throwing rocks.

h.      In 2010, a Border Patrol agent shot and killed 15-year-old Sergio Hernandez, whom a U.S. Department of Justice investigation later confirmed was unarmed and had not thrown any rocks at the agent.

i.      In 2011, a Border Patrol agent shot and killed 17-year-old Ramses Barron Torres.  Even though Torres was climbing the border fence at the time he was shot, agents alleged he was simultaneously throwing rocks.

j.      In 2011, a Border Patrol agent shot and killed Carlos La Madrid.  Even though La Madrid was climbing the border fence at the time he was shot, Border Patrol agents alleged he was simultaneously throwing rocks.

k.      On July 21, 2011, Jose Alfredo Yanez Reyes, was shot and killed in Tijuana, Mexico.  Border Patrol agents justified their shooting of Yanez, without warning, by claiming he was throwing rocks while in a tree on the southern side of the border fence.

l.      In July 2012, just a month before Arevalo's death, Border Patrol agents shot and killed Juan Pablo Santillan.  Like Arevalo, at the time of the

shooting Santillan was at the bank of the Rio Grande, but agents claim that others were throwing rocks, prompting them to shoot and kill Santillan across the border in Mexico.

50.     Each of these killings was well known among the Supervisor Defendants. Each Supervisor Defendant knew that these killings, individually and collectively, reflected a pattern and practice of Border Patrol agents treating the throwing of rocks at them as per se lethal force to which CBP policy allowed them to respond with deadly force. The Supervisor Defendants' failure and refusal to discipline the agents who fired the fatal shots in these incidents, and/or to promulgate a lawful policy regarding appropriate responses to rock-throwing, reinforced Border Patrol agents' belief that the Rocking Policy was appropriate and lawful.

### B.   Supervisor Defendants' Knowledge of and Acquiescence in Numerous Public Statements that the Rocking Policy Was Appropriate.

51.     Representatives of Border Patrol agents had regularly and publicly stated that agents were justified in treating the throwing of rocks at them as per se lethal force, regardless of whether the alleged rock-throwing posed an imminent risk of death or serious injury to the agents or anyone else, and regardless of whether the agents had available other, non-lethal alternatives. Upon information and belief, agents reiterated this same understanding of their justifiable use of lethal force to their superiors through the chain of command.

52.     For example, on June 9, 2010, the National Border Patrol Council of the American Federation of Government Employees ("NBPC") issued a nationwide press release that succinctly stated the Rocking Policy. The NBPC represents more than 17,000 Border Patrol agents and support staff.

53.     The heading of the NBPC press release stated bluntly, "Rock Assaults are Deadly Force." The statement continued, "Since biblical times rocks have been used as a crude but

effective weapon to injure and kill humans."  The statement made unmistakably clear that the Rocking Policy treated rock-throwing as per se lethal force to which agents were justified in responding with lethal force:  "Rocks are weapons and constitute deadly force.  If an agent is confronted with deadly force they will respond in kind."

54.    Similarly, in June 2010, T.J. Bonner, president of the NBPC, reiterated the Rocking Policy to the Associated Press in response to a Border Patrol agent's fatal shooting of a Mexican teenager who was standing unarmed and unthreatening across the border near El Paso, Texas.  Three separate videotapes of the incident conclusively show that the murdered teenager had not thrown any rock or anything else at the agent.  The videotapes further conclusively show that the agent's first show of any force was the use of lethal force; that if the agent somehow felt threatened, he could easily have retreated further away from the border area; and that if he still somehow felt threatened he could simply have released the person he was detaining near the border.  Despite these facts, Mr. Bonner stated on behalf of 17,000 Border Patrol agents whom he represents that the agent was justified in killing the teenager:  "It is a deadly force encounter. One that justifies the use of deadly force."

55.    In a further statement to the NBC Nightly News, Bonner crystalized the per se nature of the Rocking Policy, i.e., that it purported to justify agents' use of deadly force in response to alleged rock-throwing, regardless of whether it posed an imminent risk of death or serious injury to the agents or anyone else, and regardless of whether other, non-lethal means were available to avert any such risk.  Mr. Bonner stated that "[w]hen you pick up a rock and throw it at a police officer you should expect to have deadly force directed back toward you."

56.     Other representatives of the agents continually reiterated the same per se Rocking Policy.  For example, the Vice-President of the NBPC, Shawn Moran, told the Christian Science Monitor in April 2011, "When rocks are thrown at us, that is considered deadly force."

57.     In response to an agent's killing of another Mexican teenager who was also an innocent bystander to someone else's alleged rock-throwing, a Border Patrol spokesperson asserted flatly that "rocks are considered deadly weapons."

58.     Each Supervisor Defendant had actual knowledge of these repeated public statements by Border Patrol agents' representatives.   Despite this knowledge, none of the Supervisor Defendants countermanded any of the statements either publicly or through the chain of command.   The Supervisor Defendants' failure and refusal to countermand these public statements of the Rocking Policy reinforced Border Patrol agents' belief that the Rocking Policy was appropriate and lawful.

### C.  Supervisor Defendants' Failure and Refusal to Change the Rocking Policy After a Department of Justice Review Concluded that It Resulted in the Death of an Unarmed, Unthreatening Teenager.

59.     In June 2010 a Border Patrol agent at the border near El Paso, Texas shot across the border and killed 15-year-old Sergio Hernandez.  The agent asserted to FBI investigators that he was "surrounded" by rock-throwers and that the victim was throwing a rock when the agent shot him.   Fortunately, a passerby caught the incident on a cellphone video, and two other videotapes – one taken by the Border Patrol itself, and another by a nearby landowner – also later surfaced.  Those videos conclusively show that the agent was not surrounded; the agent was not under attack from rocks or anything else; the victim had not thrown and was not throwing any rocks; and the agent had many non-lethal alternatives available to him if he somehow felt threatened, including simply backing up further away from the border.

60.    The U.S. Department of Justice conducted an investigation of the incident and concluded that Sergio Hernandez had not thrown any rock at the agent.   But the DOJ nevertheless refused to pursue criminal charges against the agent because his conduct conformed to CBP policy.

61.    The three videos show that the murdered teenager had not thrown any rock, that the agent's first show of any force was the use of lethal force, that if the agent somehow felt threatened he could easily have retreated further away from the border area, and that if he still somehow felt threatened he could simply have let the detainee go.   The DOJ concluded that the Border Patrol's Rocking Policy permitted the use of lethal force in these circumstances: "the agent did not act inconsistently with [Border Patrol] policy or training regarding use of force." Press Release, Federal Officials Close Investigation into the Death of Sergio Hernandez-Guereca, Department of Justice, (April 27, 2012).

62.    The Supervisor Defendants were keenly aware of the DOJ's conclusion that CBP policy permitted the agent to shoot to kill Sergio Hernandez even though he was not throwing and had not thrown any rock; even though neither the agent nor anyone else was in imminent danger of death or serious bodily injury (except from the danger that the agent posed); and even though the agent had readily available alternatives to the use of deadly force.   The Supervisor Defendants nevertheless failed and refused to modify or abandon the Rocking Policy in the face of the DOJ's devastating conclusion that the patently unlawful killing of Sergio Hernandez was consistent with CBP policy and training.

**D. Supervisor Defendants' Failure and Refusal to Change the Rocking Policy Despite Repeated Pleas from National and International Human Rights Organizations.**

63.     For years before the killing of Arevalo in September 2012, national and international organizations had condemned the Border Patrol's routine use of excessive, lethal force along the southern border.  For example:

a.     In 2006, the Border Network for Human Rights reported to the United Nations that Border Patrol agents' killing of alleged rock-throwers constitutes "the use of excessive force by authorities which has arbitrarily taken the life of immigrants" in violation of binding international norms. U.S./Mexico Border Report to the United Nations Human Rights Committee Regarding the United States' Compliance with the International Covenant on Civil and Political Rights, *Behind Every Abuse Is a Community* (June 2006), at 9, http://www.bnhr.org/wp-content/uploads/2010/01/BNHR-UN-Report3.pdf.

b.     In 2008, the executive director of the American Civil Liberties Union of San Diego similarly put the Supervisor Defendants on notice: "Simply put, it is not acceptable to use lethal force when confronted with rock throwers in … border protection situations." ACLU, *U.S. Border Patrol Should Stop Using Lethal Force Against Rock Throwers* (Aug. 2008), http://www.aclusandiego.org/immigrants-rights/news-for-immigrants-rights/u-s-border-patrol-should-stop-using-lethal-force-against-rock-throwers-say-human-rights-groups-call-for-congressional-investigations-into-disproportionate-use-of-force-incidents-2/.

c.     That same year, the U.N. Committee on the Elimination of Racial Discrimination expressed concerns "about allegations of brutality and use of excessive or deadly force by law enforcement officials against persons belonging to racial, ethnic or national minorities, in particular Latino and African American persons and undocumented migrants crossing the U.S.-Mexico border."   U.N. Committee on the Elimination of Racial Discrimination, *Consideration of Reports Submitted by States Parties Under Article 9 of the Convention: Concluding observations of the Committee on the Elimination of Racial Discrimination: United States of America*, U.N. Doc. CERD/C/USA/CO/6 (May 2008).  The Committee recommended that the U.S. increase "significantly its efforts to eliminate police brutality and excessive use of force" against such persons "by establishing adequate systems for monitoring police abuses and developing further training opportunities for law enforcement officials." *Id.*

d.    In response to the killing of Sergio Hernandez near El Paso, Texas in 2010 (referred to above), the United Nation's Office of the High Commissioner for Human Rights noted that the Commissioner "had indeed received further allegations of excessive use of force by US Border Patrol agents while enforcing immigration laws" and that "OHCHR also urged the United States authorities to ensure that all the actions of the US Border Patrol were fully ascribed to the international standards applicable to officials responsible for enforcing the law."   Highlights of Regular Briefing by the Information Service (May 29, 2012), http://www.unog.ch/unog/ website/news_media.nsf/(httpNewsByYear_en)/768DA52D9D3C583FC1 257A0D004C8F42?OpenDocument.    The High Commissioner later reiterated that "[t]here have been very many young people, teeangers, who have been killed at the border," and that "[t]he reports reaching me are that there has been excessive use of force by the U.S. border patrols while they are enforcing the immigration laws."   Stephanie Nebehay, *U.S. uses excessive force along Mexican border: U.N.*, (Oct. 18, 2012), www.reuters.com/article/2012/10/18/us-mexico-us-un-rights-idUSBRE89H13F20121018.

e.    In June 2010, Mexico's Foreign Relations Department said specifically to Defendant Napolitano that it "energetically condemn[ed]" the Border Patrol's killing of Sergio Hernandez, noting particularly that "according to international standards, lethal force must be used only when the lives of people are in immediate danger and not as a dissuasive measure."  Laura Carlsen, *Lethal Force on the Border*, Huffington Post, June 18, 2010.

f.    That same month, Amnesty International issued a statement concluding that "[t]his shooting across the border appears to have been a grossly disproportionate response and flies in the face of international standards that compel police to use firearms only as a last resort, in response to an immediate, deadly threat that cannot be contained through lesser means."  *Mexican teenager shot dead by US border police* (June 10, 2013), http://www.amnesty.org/en/news-and-updates/mexican-teenager-shot-dead-us-border-police-2010-06-09; see also Amnesty International Annual Report 2011 – United States of America (May 13, 2011) (listing the killing of Sergio Hernandez under civil rights abuse of "excessive use of force").

g.    In June 2010, Jose Miguel Vivanco, the Americas Director at Human Rights Watch warned that "[t]he increasing number of border patrol killings make it clear that an open and thorough US investigation is needed" and that "[a]ny border agents found responsible for using excessive force should be held accountable."  See *Deaths of Unarmed Migrants Show Need for Prompt, Thorough Inquiry*, HUMAN RIGHTS WATCH (June 11, 2010), http://www.hrw.org/news/

2010/06/11/usmexico-investigate-border-killings.        Mr.   Vivanco
specifically noted that use of excessive, lethal force against alleged rock-
throwers violates the United Nations' Basic Principles on the Use of Force
and Firearms by Law Enforcement Officials. *Id.*

h.    In December 2010, the Inter-American Commission on Human Rights
noted in its report on United States immigration detention "the terrible
effects of certain immigration policies along the border and … the abuses
and excesses committed by officers charged with enforcing the law."
Inter-American Commission on Human Rights, Report on Immigration in
the United States: Detention and Due Process, OEA/Ser.L/V/II, Doc.
78/10         (December         30,         2010),
http://cidh.org/countryrep/USImmigration/TOC.htm.

i.    In June 2011, 60 human rights organizations (including the American
Civil Liberties Union of California, the American Friends Service
Committee, and Amnesty International USA) yet again reiterated: "To
shoot stone throwers is exceptionally disproportionate and inhumane."
Letter from American Civil Liberties Union of California, et al., to U.S.
Senator Patrick Leahy and U.S. Representative Lamar Smith (June 2011).

j.    In May 2012, 16 members of Congress wrote specifically to Defendant
Napolitano and requested an analysis of CBP's use of force policies by the
DHS in light of its national and international infamy.

64.    Despite actual knowledge of the Rocking Policy and its open and notorious
conflict with fundamental human rights guarantees, each of the Supervisor Defendants failed and
refused to modify the Rocking Policy in order to conform it to the requirements of law.

**E.   PERF's Conclusion that CBP Had an Unlawful "Policy and Practice" of
Permitting Unjustifiable Deadly Force.**

65.    The CBP commissioned the Police Executive Research Forum ("PERF"), a highly
respected non-profit organization that advises law enforcement agencies on best practices, to
review the then-extant use of lethal force policies for border patrol agents and to review the
deadly force incidents from January 2010 through October 2012.  The PERF Report confirms
that the Supervisor Defendants had permitted a policy and practice within the CBP of allowing
Border Patrol agents to unjustifiably use deadly force in response to alleged rock-throwing.

66.     The report that PERF submitted to DHS and CBP identified two "policy and practice areas" that "need significant change."   One of those two policies and practices was "using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them."  *See* http://www.cbp.gov/sites/default/files/documents/PERFReport.pdf, at p. 2.

67.     The PERF Report specifically concluded and recommended, among other things:

a.     "Review of shooting cases involving rock throwers revealed that in some cases agents put themselves in harm's way by remaining in close proximity to the rock throwers when moving out of range was a reasonable option. Too many cases do not appear to meet the test of objective reasonableness with regard to the use of deadly force." Report at p. 6.

b.     "The state[d] CBP policy should be: **"Officers/agents are prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them."** *Id.* at 7 (emphasis in original).

c.     **"While rock throwing can result in injuries or death, there must be clear justification to warrant the use of deadly force. CBP needs to train agents to de-escalate these encounters by taking cover, moving out of range and/or using less lethal weapons."** *Id.* at 9 (emphasis in original).

d.     "Deadly force shall not be used to effect an arrest or prevent the escape of a person unless that individual presents an imminent threat of death or serious physical injury to officers/agents or others."  *Id.* at 10.

e.     "When sufficient time exists officers/agents should seek cover and/or move out of range. Such action may be especially viable when the attack is coming from the other side of the border. Officers/agents are prohibited from using deadly force against subjects throwing objects not capable of causing serious physical injury or death to them" *Id.* at 12.

68.     The PERF report also found four cases between 2010-12 that specifically involved use of deadly force by agents who were in boats firing at alleged rock throwers in Mexico, specifically concluding: "It is not clear that all shootings by agents on water to counter

rock throwers meet the standard of objective reasonableness. The tactics and strategies that agents are using may unnecessarily put them in harm's way. Moving to a safer location when possible is preferable to using deadly force and such action should be considered as part of objective reasonableness." *Id.* at 7-8.

69.     On November 5, 2013, Defendant Fisher announced that the agencies had decided to reject the expert, objective recommendations that CBP had commissioned PERF to provide, and instead to reaffirm yet again the unlawful Rocking Policy. *See Associated Press Exclusive: Border Patrol Rejects Curbs on Force* (November 5, 2013) http://bigstory.ap.org/article/ap-exclusive-border-patrol-rejects-curbs-force.

70.     On March 7, 2014, at the insistence of the newly installed Secretary of Homeland Security, Jeh Johnson, Defendant Fisher then amended (in his words "clarified") the policy.  In a memorandum to agents he stated for the first time that agents should, among other things:

a.     "avoid placing themselves in positions where they have no alternative to using deadly force;"

b.     "not discharge firearms in response to thrown or hurled projectiles unless the agent has a reasonable belief, based on the totality of the circumstances, to include the size and nature of the projectiles, that the subject of such force poses an imminent danger of death or serious injury;" and

c.     first "seek[] cover or distanc[e] themselves from the immediate area of danger."

71.     Defendant Bersin had issued CBP's use of force policy in October 2010 with no attempt to address what he and the other Supervisor Defendants knew or reasonably should have known was a pattern and practice of border agents unjustifiably using deadly force in response to alleged rock throwers.  Defendant Napolitano, as Secretary of DHS, approved CBP's October

2010 policy handbook despite having been specifically told by Mexican officials and others of such unlawful practices by border agents.

72.     In May 2014—after Defendants Napolitano, Bersin, Aguilar, and Kostelnik had stepped down from their supervisor roles at DHS and CBP—CBP finally revised its Use of Force Policy Handbook.

*See* http://www.cbp.gov/sites/default/files/documents/UseofForcePolicyHandbook.pdf
The Policy stated for the first time, among other things, that:

> Authorized Officers/Agents shall not discharge their firearms in response to thrown or launched projectiles unless the officer/agent has a reasonable belief, based on the totality of circumstances (to include the size and nature of the projectiles), that the subject of such force poses an imminent danger of serious physical injury or death to the officer/agent or to another person.
>
> Officers/agents may be able to obtain a tactical advantage in these situations, through measures such as seeking cover or distancing themselves from the immediate area of danger.

73.     This change in policy, while potentially welcome (assuming it is adequately implemented), came too late to protect Plaintiffs from the wholly unnecessary loss of their husband and father.

**F.  Officials' Statements Regarding the Existence and Unlawfulness of the Rocking Policy.**

74.     James F. Tomsheck, the former Assistant Commissioner for Internal Affairs at CBP has recently acknowledged the existence and unlawfulness of the Rocking Policy.  *See* Andrew Becker, *Ousted Chief Accuses Border Agency of Shooting Cover-Ups, Corruption* (Aug. 14, 2014), https://beta.cironline.org/reports/ousted-chief-accuses-border-agency-of-shooting-

cover-ups-corruption/?utm_source=CIR&utm_medium=social_media&utm_campaign=twitter.

Among other things, Tomsheck admitted:

a.     Border Patrol Agents actively and consistently tried to distort the narratives around fatal shootings to cover up wrongdoing by border agents. Tomsheck stated that at least seven Border Patrol shooting deaths since just 2010 were "highly suspect." Yet in none of those instances did the Supervisor Defendants take any disciplinary action against the shooter.

b.     Rather than respond to the shootings appropriately, Border Patrol officials intentionally thwarted the internal affairs agency's investigation. "In nearly every instance, there was an effort by Border Patrol leadership to make a case to justify the shooting versus during a genuine, appropriate review of the information and the facts at hand."

c.     Top officials at DHS and CBP intentionally turned a blind eye to the consistent pattern of unjustified killings. "There were certainly many cases where border patrol agents or certainly CBP officers engaged in excessive use of force or abuse of migrants at the border that should have resulted in discipline where it did not." *See* Anna Werner, *order Patrol Killings Face Renewed Scrutiny* (Aug. 19, 2014), http://www.cbsnews.com/news/investigating-unresolved-deaths-on-the-border/

d.     Top agency officials intentionally created a culture and atmosphere that promoted the excessive use of force. **"**The Border Patrol has a self-identity of a paramilitary border security force and not that of a law enforcement agency." *Id*.

e.     Accordingly to published reports, Tomsheck said that "senior officials at Customs and Border Protection and elsewhere in the Department of Homeland Security interfered with, delayed or hindered his office from being more aggressive in rooting out corruption, abuse and other misconduct, including civil rights violations, by telling internal affairs to stand down or back off." Andrew Becker, *Ousted Chief Accuses Border Agency of Shooting Cover-Ups, Corruption* (Aug. 14, 2014), https://beta.cironline.org/reports/ousted-chief-accuses-border-agency-of-shooting-cover-ups-corruption/?utm_source=CIR&utm_medium=social_media&utm_campaign=twitter.

f.     Tomsheck places much of the blame on Defendant Aguilar, who directed that Border Patrol management take control of deadly force investigations before the internal affairs department could review them. According to reports, Tomsheck said with respect to use of excessive force that

"Allegations of wrongdoing he believed needed to be investigated instead would go to Border Patrol management for review and discipline. Those inquiries went nowhere or were inadequate." *Id.* Tomsheck and other internal affairs investigators were then required to "fall in line" behind the Aguilar-directed conclusions.

75. Despite knowing or having reason to know of the widespread use of excessive, lethal force, the Supervisor Defendants failed to take timely and effective measures to prohibit, prevent, and punish such practices and to discipline the perpetrators and responsible commanders, who were all under Supervisor Defendants' actual or effective command. Supervisor Defendants had an actual opportunity and a legal duty to prevent abuses by their subordinates before Arevalo was killed, yet failed to take the necessary and required action. The Supervisor Defendants' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of excessive, lethal force.  As a direct and foreseeable result of this failure, the Agents unlawfully killed Arevalo.

## V. THE SUPERVISOR DEFENDANTS' FAILURE AND REFUSAL TO ADEQUATELY TRAIN THE AGENTS.

76. Supervisor Defendants also knowingly failed to provide for adequate training of Border Patrol agents concerning the proper use of force.  Supervisor Defendants failed to ensure that agents knew that the Rocking Policy was unlawful under international and domestic law.

77. Supervisor Defendants also failed to provide proper training to agents who may encounter rock throwing, including Defendants Lambrecht, Boatwright, and the other Agents. During the time that Agents were trained, the Supervisor Defendants systematically failed and refused to, among other things:

      a.     Train new agents at CBP's basic academies on all less-lethal options;

29

b.      Sufficiently train new agents at CBP's basic academies on specific situations, including rock throwing;

c.      Train agents in tactics to de-escalate use of force situations in order to prevent them from becoming deadly force incidents;

d.      Ensure that agents understood and followed a proper use of force policy;

e.      Provide scenario-based training to give agents the opportunity to practice real-life use of force situations;

f.      Provide training in low-light conditions;

g.      Provide agents the full number of required training hours;

h.      Give written tests during less-lethal force recertification training; and

i.      Standardize use of force policies across the CBP.

78.      Supervisor Defendants knew and had reason to know that the lack of training created a permissive environment in which their subordinates believed that the Rocking Policy and the use of excessive, lethal force would be tolerated or approved.    The Supervisor Defendants' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to the use of excessive, lethal force.  As a direct and foreseeable result of this failure, the Agents unlawfully killed Arevalo.

## VI.   INTERNATIONAL AND DOMESTIC STRICTURES ON EXCESSIVE, LETHAL FORCE

79.      Extrajudicial killing is universally prohibited by the laws of all civilized societies. The prohibitions against use of excessive, lethal force are absolute, non-discretionary, and subject to no exception. They are designed to safeguard the security, dignity, and life of every human being.  The prohibition against extrajudicial killing is a peremptory, *jus cogens* norm – a specific, universal, and obligatory norm from which no nation may lawfully depart.   It is

universally recognized and binding on all persons under all circumstances.  The Rocking Policy
flagrantly violates this peremptory international norm.

80.    The international law provisions forbidding extrajudicial killing include Article
6(1) of the International Covenant on Civil and Political Rights ("ICCPR"), S. Exec. E, 95-2, 999
U.N.T.S. 171, 1966 U.S.T. LEXIS 521 (opened for signature Dec. 16, 1966, entered into force
Mar. 23, 1976, ratified by Mexico Mar. 23, 1981, ratified by U.S. June 8, 1992).  That Article
provides that "[n]o one shall be arbitrarily deprived of his life."  *See also id.* at art. 9(1)
("Everyone has the right to liberty and security of person . . . . No one shall be deprived of his
liberty except on such grounds and in accordance with such procedure as are established by
law.").  The *jus cogens* norm against extrajudicial killings is universally recognized by all
civilized nations.  *See, e.g.*, the Universal Declaration of Human Rights, Dec.10, 1948, art. 3,
G.A. Res. 217A(III), U.N. Doc. A/810; American Declaration of the Rights and Duties of Man,
art.     I,     O.A.S.     Res.     XXX     (May     2,     1948),     http://www.cidh.org
/Basicos/English/Basic2.American%20Declaration.htm;     Restatement     (Third)     of     Foreign
Relations § 702 cmt. f, n (1987).

81.    U.S. courts have recognized that extrajudicial killing is among the gravest
violations of the law of nations.  *See, e.g.*, *Chavez v. Carranza*, 559 F.3d 486, 491 (6th Cir.
2009); *Sarei v. Rio Tinto, PLC*, 456 F.3d 1069, 1091 (9th Cir. 2006) (en banc); *Cabello v.
Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005); *Kadic v. Karadzic*, 70 F.3d 232, 243-
44 (2d Cir. 1995); *In re Estate of Ferdinand Marcos, Human Rights Litig.*, 25 F.3d 1467, 1475
(9th Cir. 1994).

82.    The peremptory norm against extrajudicial killing includes a prohibition on police
use of excessive, lethal force.  Police use of excessive, lethal force is one of the core forms of

"extrajudicial killings" defined by international law. Specifically, "intentional lethal use of firearms [by police] may only be made when strictly unavoidable in order to protect life." Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Aug. 27-Sept. 7, 1990, Havana, Cuba, Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, art. 9 (1990). Again, this *jus cogens* norm is recognized by all civilized societies. *See, e.g.*, Code of Conduct for Law Enforcement Officials, G.A. Res. 34/169, U.N. Doc. A/RES/34/169, Annex I, art. 3 (Dec. 17, 1979); Principles on the Prevention of Human Rights Violations Committed with Small Arms, Sub-Com. Res. 2006/22, Annex, U.N. Doc. A/HRC/Sub.1/58/L.11/Add.1 at 6 (Aug. 24, 2006), U.N. Special Rapporteur on extrajudicial, summary or arbitrary executions, Report to General Assembly, ¶¶33-45, U.N. Doc. A/61/311 (Sept. 5, 2006); U.N. Human Rights Committee, General Comment 6, 16th Sess., art. 6 (1982).

83. These binding standards are incorporated into standard training manuals for police the world over. *See, e.g.*, Commonwealth Secretariat, Commonwealth Manual on Human Rights Training for Police 65 (2006) ("Unnecessary and unlawful use of deadly force by a police officer would therefore constitute a violation of the right to life"); Organization for Security and Cooperation in Europe, Guidebook on Democratic Policing 23 (2d ed. 2008) ("Intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life."); International Committee for the Red Cross, Human Rights and Humanitarian Law in Professional Policing Concepts 22 (2002) ("The intentional lethal use of firearms is allowed only when strictly unavoidable to protect life.").

84. For decades, the U.S. Department of State has insisted that the international norm against extrajudicial killings includes "deliberate, illegal, and excessive use of lethal force by the police, security forces, or other agents of the State whether against criminal suspects, detainees,

prisoners, or others."   U.S. Dep't of State, Country Report on Human Rights Practices 1995,

Appendix A: Notes on the Preparation of the Reports (March 1996); *see also id*. ("lethal use of

excessive force by security forces ... is herein defined as a form of extrajudicial killing"); U.S.

Department of State Country Report on Human Rights Practices 1997 - Papua New Guinea

(police's unreasonable killing of innocent bystander is extrajudicial killing).   The State

Department also acknowledges that this *jus cogens* norm prohibits police from responding with

lethal force to alleged rock-throwers.   *See, e.g.*, Country Reports on Human Rights Practices-

2010: India, United States Department of State Bureau of Democracy, Human Rights and Labor,

April 2011, http://www.state.gov/j/drl/rls/hrrpt/2010/sca/154480.htm ("[P]rotesters threw stones

and rocks at security forces, and security forces retaliated with excessive or deadly force."); 

Country Reports on Human Rights Practices – 2002: Israel and the Occupied Territories, United

States Department of State Bureau of Democracy, Human Rights and Labor, March 2003,

http://www.state.gov/j/drl/rls/hrrpt/2010/nea/154463.htm ("The use of lethal force against a

rock-thrower, in this instance and in many others like it, was excessive."); Country Reports on

Human Rights Practices – 2004: Tanzania, United States Department of State Bureau of

Democracy,          Human          Rights          and          Labor,          February          2005,

http://www.state.gov/j/drl/rls/hrrpt/2004/41630.htm.   ("During the year, the use of excessive

force by security forces resulted in at least two deaths … [including one where] a member of a

paramilitary unit fired into a crowd, killing a 16-year-old student and seriously wounding two

other persons" who had been part of "a mob [that] had thrown stones at members of the

paramilitary unit.").

85.   The United States incorporates into its domestic law the peremptory international

norm against extrajudicial killing by police use of excessive, lethal force.   As the Executive

Branch advised the Senate, with few exceptions not relevant here, "the substantive provisions of [the ICCPR] are entirely consistent with the letter and spirit of the United States Constitution and laws."  Letter of Transmittal from the President to the Senate, 1966 U.S.T. LEXIS 521, at *2 (Feb. 23, 1978).  For example, the Supreme Court has held that police use of deadly force is permissible only when "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. . . ."  *Tennessee v. Garner*, 471 U.S. 1, 3 (U.S. 1985).  Domestic law makes this peremptory norm specifically applicable to the use of lethal force by U.S. Border Patrol agents.  8 C.F.R. § 287.8(a)(2)(ii) ("Deadly force may be used only when a designated immigration officer. . . has reasonable grounds to believe that such force is necessary to protect the designated immigration officer or other persons from the imminent danger of death or serious physical injury").

## VII.  APPLICABLE TREATIES

86.     The Rocking Policy also violated the sovereignty of Mexico by permitting Border Patrol agents to fire their weapons into Mexico's sovereign territory.  Article V of the Treaty of Guadalupe Hidalgo establishes the border between the United States and Mexico and provides that the border "shall be religiously respected by each of the two republics."  Treaty of Peace, Friendship, Limits, and Settlement with the Republic of Mexico, 9 Stat. 922, art. IX (1850); *see also id.* at art. I ("There shall be firm and universal peace between the United States of America and the Mexican republic"); Gadsden Treaty Relating to the Boundaries of 1853, 10 Stat. 1035, art. I.  Likewise, the Charter of the United Nations, Ch. 1, art. 2 (1945), provides that "[a]ll Members shall refrain in their international relations from the threat or use of force against the

territorial integrity or political independence of any state, or in any other manner inconsistent with the Purposes of the United Nations."

87.    The Rocking Policy permitted Border Patrol agents to fire their weapons into the sovereign territory of Mexico.  For example, the teenager killed near El Paso was clearly within Mexican territory when Border Patrol agents shot him.  Yet the U.S. Department of Justice concluded with respect to the El Paso killing, for example, that "the agent did not act inconsistently with [Border Patrol] policy or training."  Border Patrol spokespersons have confirmed that Border Patrol policy allows agents to fire their weapons into Mexico's territory.

88.    The Border Patrol's policy of permitting agents to fire lethal shots into the territory of Mexico violates that nation's sovereignty.  The Government of Mexico has asserted with respect to the El Paso killing, for example, that "[a]n invasion of Mexico's sovereignty occurred when Agent Mesa shot his gun across the border at Sergio Hernández."  Brief for the Government of the United Mexican States as Amicus Curiae in Support of Appellants in No. 12-50217, U.S. Ct. App. Fifth Circuit, No. 11-50792, filed July 2, 2012, at 15.

89.    Defendants Lambrecht and Boatwright fired the fatal shots at Arevalo without regard to Mexico's sovereign boundary and despite knowledge that Arevalo was within Mexico. The Rocking Policy and the killing of Arevalo violated Mexico's sovereignty.

90.    Moreover, bilateral agreements between the United States and Mexico imposed on Defendants an unequivocal obligation to respect Arevalo's fundamental right to life regardless of whether he was in Mexico or the United States.  *See, e.g.*, Convention Between the United States of America and other American Republics Regarding the Status of Aliens, 46 Stat. 2753, art. V (1928) ("States should extend to foreigners, domiciled or in transit through their territory, all individual guarantees extended to their own nationals, in the enjoyment of essential

35

civil rights without detriment, as regards to foreigners, to legal provisions governing the scope of and usages for the exercise of said rights and guarantees"); Convention on the Rights and Duties of States, Dec. 26, 1933, art. IX, 165 L.N.T.S. 19, *reprinted in* 28 Am. J. Int'l 75 (Supp. 1934) ("Nationals and foreigners are under the same protection of the law and the national authorities and the foreigners may not claim rights other or more extensive than those of the nationals").

## VIII. INTENTIONAL DISCRIMINATION

91.     The Rocking Policy reflected intentional discrimination against Arevalo and others on the basis of their Hispanic descent and perceived Mexican origin, thus violating their substantive due process rights guaranteed under the United States Constitution.  The Rocking Policy authorized the use of excessive force against them based solely on their race, ethnicity, and/or perceived national origin.  The Rocking Policy is one part of a broader U.S. effort to "get tough" on unauthorized immigration by persons of Hispanic descent and Mexican nationality. The Policy is an integral ingredient of a rancid brew of racial, ethnic, and nationalist animus, and it would not have existed but for this animus against persons of Hispanic descent and Mexican origin.

92.     Recent studies have confirmed that this and other mistreatment of migrants at the border is the result of an institutional culture of abuse within the CBP, rather than the actions of a few rogue agents.  Daniel E. Martinez, Jeremy Slack, and Josiah Heyman, Bordering on Criminal Part I: Migrant Mistreatment while in U.S. Custody, Immigration Policy Center, December 2013, at 2.   This culture could have developed only through the active encouragement or deliberate indifference of the Supervisor Defendants.

93. The Supervisor Defendants failed to take any steps to reform the CBP, despite complaints from watchdog groups and the highly publicized incidents of unprovoked border shootings discussed elsewhere in this complaint. *See, e.g.*, Scott Phillips, Nestor Rodriguez, and Jacqueline Hagan, Brutality at the Border: Use of Force in the Arrest of Immigrants in the United States, International Journal of Sociology and the Law 30, no. 4, Dec. 2002, at 285-306; Scott Phillips, Jacqueline Maria Hagan, and Nestor Rodriguez, Brutal Borders? Examining the Treatment of Deportees during Arrest and Detention, Social Forces 85, no. 1, Sept. 2006, at 93-109.

94. Despite this notice, the Supervisor Defendants failed to make any attempts to prevent further mistreatment and discrimination. This inaction by the Supervisor Defendants indicates either tacit approval of or deliberate indifference to the widespread institutional culture of discrimination and abuse within the CBP.

95. No other law enforcement agency in the country, whether local, state, or national, permitted its officers to treat the throwing of rocks at them as per se lethal force that the officers can legitimately counter with fatal gunfire. Nor did the Border Patrol condone or implement a similar policy of systematic, institutionalized use of excessive, lethal force with respect to encounters between Border Patrol agents and foreign civilians at the nation's northern border, or with respect to any other ethnic or national group. Supervisor Defendants would not condone or authorize the systematic, institutionalized use of excessive, lethal force against Canadians or Caucasians. Supervisor Defendants condoned, authorized, and implemented the Rocking Policy solely because its victims were persons of Hispanic descent and Mexican nationality.

## IX.   DEFENDANTS' CAPACITY

96.    Each of the Defendants caused injury and damage to Plaintiffs by personally participating in the unlawful conduct, or acting jointly or conspiring with others to act; authorizing or allowing, explicitly or implicitly, policies, plans, customs, practices, actions, or omissions that led to the unlawful conduct; failing to take action to prevent the unlawful conduct; failing or refusing to initiate and maintain adequate training or supervision; being deliberately indifferent to Arevalo's rights; and ratifying the unlawful conduct that occurred by agents under their direction and control, including failing to take remedial or disciplinary action.

97.    At all relevant times, Defendants were the agents, employees, servants, joint ventures, partners and/or coconspirators of the other Defendants named in this Complaint; and each of the Defendants was acting within the purported course and scope of that relationship with the other Defendants. At all relevant times, the Defendants were acting under color of the law and under color of their legal authority.

## CAUSES OF ACTION

### First Claim for Relief:

### Violation of the Law of Nations (Against the United States)

98.    Plaintiffs repeat and re-allege, in each of their claims for relief, all of the allegations set forth above.

99.    The Rocking Policy and the United States' acts and omissions described herein violated the law of nations, which prohibits extrajudicial killing.

100.    The United States' actions and omissions were the direct and proximate cause of Arevalo's death and give rise to a cause of action for a tort in violation of the law of nations.

101.    The United States had effective command and control of the Agents who intentionally and knowingly used excessive, unlawful force to kill Arevalo, which is prohibited by the law of nations.

102.    In addition to its liability for the unlawful use of excessive, lethal force caused by their affirmative orders and authorizations, the United States is also liable on the independent ground that it violated its legal duty to prevent and prohibit the use of excessive, lethal force by subordinates when the United States' officials knew and had reason to know of it.   Despite numerous credible reports of use of excessive, lethal force—indeed, despite incontrovertible video evidence of such unlawful use of force—the United States failed to take the reasonable, necessary, timely, or adequate measures against subordinates to prohibit and prevent such excessive, lethal force as required by law.   To this day, none of the key command officials responsible for this widespread and systemic unlawful use of force have been disciplined.   The United States acted with deliberate indifference to and in conscious disregard of the high likelihood that people such as Arevalo would die as a result of Border Patrol agents' use of excessive, lethal force.

103.    The United States issued orders, adopted policies, and granted authorizations that foreseeably led to the widespread use of excessive, lethal force, including against Arevalo.   In doing so, the United States authorized a deviation from longstanding international and domestic law prohibiting the use of excessive, lethal force.   The United States also failed to take action to stop and prevent the use of excessive, lethal force after it had knowledge that its officers and agents were committing or permitting such unlawful use of force.   Through its actions and

derelictions, the United States expressly permitted the use of excessive, lethal force.  The United States permitted such unlawful force whether the victims were within the United States or Mexico.

104.    The United States is liable for Arevalo's death under the law of nations, because officials, agents, and/or supervisors formulated, authorized, approved, directed, and ratified the Rocking Policy.

105.    In addition, the United States is liable because its officers and agents intentionally and systematically used excessive, lethal force while acting under its effective command and control, and knew and had reason to know of its officers' and agents' actions but failed to prevent or punish them.

106.    The United States' deliberate killing of Arevalo was not authorized by the doctrine of self-defense.

107.    The United States' deliberate killing of Arevalo was not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

108.    The United States' conduct caused grave and foreseeable injury (namely death) to Arevalo.

109.    The United States is liable for its conduct that led to the extrajudicial killing of Arevalo.

110.    Defendants are liable for the harm caused to Arevalo's family members.  The family members were forced to suffer—and continue to suffer—severe physical and psychological abuse and agony as a result of the extrajudicial killing.

111.    The United States is liable for money damages to Plaintiffs in an amount to be determined at trial.

112.    The United States' violations of Arevalo's rights were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**Second Claim for Relief:**

**Fifth Amendment Due Process (Against Supervisor Defendants)**

113.    Supervisor Defendants' actions described herein violated Arevalo's substantive and procedural due process rights under the Fifth Amendment to the U.S. Constitution. Supervisor Defendants violated Arevalo's Fifth Amendment due process rights by personally developing, authorizing, and conspiring to effect, or permitting or directing their subordinates to implement, the Rocking Policy. Supervisor Defendants also violated Arevalo's Fifth Amendment due process rights by failing to establish adequate procedures to train the Border Patrol agents, failing to establish adequate disciplinary procedures and adequate procedures to investigate agents' misconduct, and acting and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force.

114.    As a foreseeable result of the Supervisor Defendants' acts and omissions, the Agents used lethal force against Arevalo in the circumstances described above. Supervisor Defendants were aware of the danger and risk of serious harm or death that Arevalo and others faced as a result of the Rocking Policy. Supervisor Defendants nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Arevalo's death.  Arevalo's death was a foreseeable result of Supervisor Defendants' actions and omissions.

115.    Each of the Supervisor Defendants had actual or constructive knowledge that his or her acts and omissions with respect to Arevalo violated his due process rights, and each had actual or constructive knowledge that its, his, or her actions, orders, or omissions would lead to such violations.

116.    Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's due process rights.

117.    The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

118.    The Supervisor Defendants' violations of Arevalo's due process rights were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Third Claim for Relief

**Fifth Amendment Due Process (Against Each of the Agents)**

119.    The Agents' actions described herein violated Arevalo's substantive and procedural due process rights under the Fifth Amendment to the Constitution.  The Agents violated Arevalo's Fifth Amendment due process rights by using lethal force against him in the circumstances described above.

120.    As set forth in detail above, the Agents used excessive force against Arevalo, and the Agents' conduct in committing these acts was not reasonable in light of all the circumstances.

121.    DOE Defendants are also liable for this constitutional violation because they witnessed this illegal conduct but took no action to protect Arevalo, ratified Agents Lambrecht's and Boatwright's illegal conduct after it had occurred, and/or conspired with Agents Lambrecht and Boatwright to commit and/or cover-up this illegal conduct.

42

122.     The Agents were aware of the danger and risk of serious harm or death that Arevalo faced as a result of the Agents' use of excessive force.   The Agents nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Arevalo's death. Arevalo's death was a foreseeable result of the Agents' actions and omissions.

123.     Each of the Agents had actual or constructive knowledge that his conduct toward Arevalo violated his due process rights, and each had actual or constructive knowledge that his actions or omissions would lead to such violations.

124.     Each of the Agents acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's due process rights.

125.     The Agents are liable for money damages to Plaintiffs in an amount to be determined at trial.

126.     The Agents' violations of Arevalo's due process rights were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### Fourth Claim for Relief

**Fourth Amendment Unreasonable Seizure (Against Supervisor Defendants)**

127.     The Supervisor Defendants' actions described herein violated Arevalo's right to be free from unreasonable seizure under the Fourth Amendment to the U.S. Constitution. Supervisor Defendants violated Arevalo's Fourth Amendment rights by personally developing, authorizing, and conspiring to effect, and permitting and directing their subordinates to implement, the Rocking Policy.   Supervisor Defendants also violated Arevalo's Fourth Amendment rights by failing to establish adequate procedures to train the Border patrol agents,

failing to establish adequate disciplinary procedures and adequate procedures to investigate agents' misconduct, and acting and failing to act in disregard of previous allegations of Border Patrol agents' use of excessive, lethal force.

128.    As a foreseeable result of Supervisor Defendants' acts and omissions, the Agents used lethal force against Arevalo in the circumstances described above.  Supervisor Defendants were aware of the danger and risk of serious harm or death that Arevalo and others faced as a result of the Rocking Policy.  Supervisor Defendants nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Arevalo's death. Arevalo's death was a foreseeable result of Supervisor Defendants' actions and omissions.

129.    Each of the Supervisor Defendants had actual or constructive knowledge that his or her acts or omissions with respect to Arevalo violated his right to be free from unreasonable seizure, and each had actual or constructive knowledge that his or her actions, orders, or omissions would lead to such violations.

130.    Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's rights.

131.    The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

132.    The Supervisor Defendants' violations of Arevalo's right to be free from unreasonable seizure were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**Fifth Claim for Relief**

**Fourth Amendment Unreasonable Seizure (Against Agents)**

133.    The Agents' actions described herein violated Arevalo's right to be free from unreasonable seizure under the Fourth Amendment to the U.S. Constitution.   The Agents violated Arevalo's Fourth Amendment rights by using lethal force against him in the circumstances described above.

134.    As set forth in detail above, Agents Lambrecht, Boatwright and DOE Defendants used excessive force against Arevalo, and Agents Lambrecht, Boatwright and DOE Defendants' conduct in committing these acts was not reasonable in light of all the circumstances.

135.    DOE Defendants are also liable for this constitutional violation because they witnessed this illegal conduct but took no action to protect Arevalo, ratified Agents Lambrecht's and Boatwright's illegal conduct after it had occurred, and/or conspired with Agents Lambrecht and Boatwright to commit and/or cover-up this illegal conduct.

136.    The Agents were aware of the danger and risk of serious harm or death that Arevalo and others faced as a result of their use of excessive force.   The Agents nevertheless personally took affirmative steps that created and/or increased this danger and risk, which did, in fact, result in Arevalo's death.   Arevalo's death was a foreseeable result of the Agents' actions and omissions.

137.    Each of the Agents had actual or constructive knowledge that his conduct toward Arevalo violated his right to be free from unreasonable seizure, and each had actual or constructive knowledge that his actions, orders, or omissions would lead to such violations.

138.    Each of the Agents acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's rights.

139.   The Agents are liable for money damages to Plaintiffs in an amount to be determined at trial.

140.   The Agents' violations of Arevalo's right to be free from unreasonable seizure were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

**Sixth Claim for Relief:**

**Fifth Amendment Equal Protection (Against Supervisor Defendants)**

141.   Arevalo had a constitutionally protected right under the Fifth Amendment to the United States Constitution to be free from intentional discrimination against him on the basis of his race, ethnicity, and national origin.

142.   Supervisor Defendants acted under color of law with a discriminatory purpose and treated Arevalo and others differently because of their race, ethnicity, and national origin. The Supervisor Defendants intentionally discriminated against Arevalo and others on the basis of their Hispanic descent and Mexican origin by authorizing the use of excessive force against them solely on the basis of their race, ethnicity, and/or perceived national origin.

143.   Each of the Supervisor Defendants had actual or constructive knowledge that his or her conduct toward Arevalo violated his right to be free from such discrimination, and each had actual or constructive knowledge that his or her actions, orders, or omissions would lead to such violations.

144.   Each of the Supervisor Defendants acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's rights.

145.   The Supervisor Defendants are liable for money damages to Plaintiffs in an amount to be determined at trial.

46

146.    The Supervisor Defendants' violations of Arevalo's right to be free from discrimination based on race, ethnicity, or national origin were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## Seventh Claim for Relief:

### Fifth Amendment Equal Protection (Against Agents)

147.    Arevalo had a constitutionally protected right under the Fifth Amendment to the United States Constitution to be free from intentional discrimination against him on the basis of his race, ethnicity, and national origin.

148.    The Agents acted under color of law with a discriminatory purpose and treated Arevalo differently because of his race, ethnicity, and national origin.  The Agents intentionally discriminated against Arevalo on the basis of his Hispanic descent and Mexican origin by using excessive force against him solely on the basis of his race, ethnicity, and/or perceived national origin.

149.    The Agents had actual or constructive knowledge that their conduct toward Arevalo violated his right to be free from such discrimination, and each of the Agents had actual or constructive knowledge that his actions or omissions would lead to such violations.

150.    The Agents acted under color of official authority and with deliberate, reckless, or callous indifference to Arevalo's rights.

151.    The Agents are liable for money damages to Plaintiffs in an amount to be determined at trial.

152.    The Agents' violations of Arevalo's right to be free from discrimination based on race, ethnicity, or national origin were deliberate, willful, intentional, wanton, malicious, and

47

oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment including:

a.   Compensatory damages against all Defendants in an amount to be proven at trial;

b.   Punitive damages against all Defendants in an amount to be determined at trial;

c.   Reasonable attorneys' fees and costs of suit;

d.   Such other relief as the Court deems just and reasonable.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury as to each and every cause of action against each and every defendant.

Date: August 27, 2014.

/s/ Robert C. Hilliard
Robert C. Hilliard
State Bar No. 09677700
Federal ID No. 5912
HILLIARD MUNOZ GONZALES, LLP
719. S. Shoreline Blvd. Ste. 500
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFFS**

**OF COUNSEL:**

Catherine D. Tobin
State Bar No. 24013642
Federal ID No. 25316
Email: catherine@hmglawfirm.com

Rudy Gonzales, Jr.
State Bar No. 08121700
Federal ID No. 1896
rudy@hmglawfirm.com

Marion M. Reilly
State Bar No. 24079195
Federal ID No. 1357591
marion@hmglawfirm.com

HILLIARD MUNOZ GONZALES, LLP
719. S. Shoreline Blvd. Ste. 500
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Fax: (361) 882-3015

Steve D. Shadowen (*pro hac vice* application to be filed)
Pennsylvania State Bar No. 41953
steve@hilliardshadowenlaw.com

Matthew C. Weiner (*pro hac vice* application to be filed)
Pennsylvania State Bar No. 314453
matt@hilliardshadowenlaw.com

HILLIARD & SHADOWEN LLP
39 W. Main Street
Mechanicsburg, PA 17055
Telephone: (855) 344-3298
Facsimile: (512) 233-2824